IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10-00211-01-CR-W-HFS |
| ) | |
| JEREMY A. SILKWOOD, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Silkwood's Motion to Suppress Evidence and Statements (doc #15). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On July 21, 2010, the Grand Jury returned a one count indictment against defendant Jeremy A. Silkwood. The indictment charges that on April 20, 2010, defendant Silkwood, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, which had been transported in interstate commerce.

On January 27, 2011, an evidentiary hearing was begun on defendant's motion to suppress. Defendant Silkwood was represented by Assistant Federal Public Defender Anita Burns. The Government was represented by Assistant United States Attorney D. Michael Green. The Government called Corporal Michael Lewis, Officer Robert Warner and Officer Teague Grey of the Excelsior Springs Police Department and Deputy Sheriff Dustin Fisher of the Clay County Sheriff's Office as witnesses. The defense called Magdalen Peterson, defendant's girlfriend, to testify.

The evidentiary hearing was continued on February 16, 2011. The testimony of Magdalen Peterson was concluded. The defense then called Bobbi Jo McCubbin and a minor, B.S., to testify. The Government recalled Corporal Lewis and Officer Warner to testify in rebuttal.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearings, the undersigned submits the following proposed findings of fact:

1. On April 20, 2010, officers in Excelsior Springs, Missouri, were conducting different types of saturations throughout the city for illegal activity, including knock and talks. (Tr. I[1] at 4) Corporal Lewis explained that a "knock and talk" is where officers go to a suspected narcotics residence, knock on the front door and make contact with whomever answers the door, explain the reason the officers are there and ask to come inside. (Tr. I at 4)

2. On April 20, 2010, prior to the knock and talk at the apartment in question, Corporal Lewis conducted surveillance on the apartment for approximately one hour from a parking lot where he had a view of one of the bedroom windows of the apartment. (Tr. I at 5-6, 21) Corporal Lewis was familiar with the apartment and knew that Bobbi Jo McCubbin resided at the apartment. (Tr. I at 5) Corporal Lewis observed that there were numerous people inside the apartment, walking in and out of the bedroom. (Tr. I at 6, 21) Items consistent with drug use were later recovered from this bedroom. (Tr. I at 27-28; Defendant's Ex. 1 at 3) Corporal Lewis testified that this was not the first time he had observed heavy traffic coming and going from this apartment complex. (Tr. I at 19) Corporal Lewis testified that he had previously seen Jeremy Silkwood and several other subjects who are known narcotics users or sellers come and go from the subject apartment. (Tr. I at 30)

3. Corporal Lewis met with the officers that were assigned to him that night (from the Excelsior Springs Police Department and the Clay County Sheriff's Office drug task force who were assisting with the operation) in the parking lot of the police department. (Tr. I at 6-7) The officers parked down the street from the apartment building and walked to the apartment. (Tr. I at 7-8) The officers arrived at the apartment building at approximately 11:06 p.m. (Defendant's Ex. 1 at 2) Some of the officers went to the back of the building, while Corporal Lewis and others went to the front of the apartment complex. (Tr. I at 8)

4. As Corporal Lewis approached the closed door of the apartment in question, he testified that he noticed a distinct smell of burnt marijuana. (Tr. I at 8-9) Officer Warner testified that as he was walking up the stairs to the second level of the apartment building, he was able to smell the odor of burnt marijuana. (Tr. I at 34) Officer Teague Grey testified that he smelled an odor of marijuana in the apartment building when he entered the building. (Tr. I at 44-45) Officer Warner and Grey each testified that as they were standing outside the door to the subject apartment, the smell of burnt marijuana was stronger. (Tr. I at 34, 45) Corporal Lewis stood on one side of the closed apartment door and Officer Grey on the other side. (Tr. I at 9) Officer Grey was in uniform. (Tr. I at 44) Corporal Lewis and Officer Warner each testified that as they stood outside the closed door, they heard a male subject inside the apartment state that he had "a half pound of weed." (Tr. I at 9, 34) Corporal Lewis then knocked on the door. (Tr. I at 10, 25) No one answered the

---

[1]"Tr. I" refers to the transcript of the hearing held on January 27, 2011.

door, so Corporal Lewis knocked a second time.[2] (Tr. I at 10; Tr. II at 33)

5. Bobbi Jo McCubbin answered the door.[3] (Tr. I at 10, 45) Corporal Lewis and Officers Warner and Grey each testified that when McCubbin opened the door, they could smell burnt marijuana and that the odor was stronger than it had been outside the door.[4] (Tr. I at 10-11, 35, 45) Corporal Lewis testified that he also observed numerous people in a room filled full of smoke. (Tr. I at 10-11) Officer Grey also testified that there was smoke inside the apartment. (Tr. I at 45) In the middle of the living room floor was a plate containing green leafy substances and rolling papers. (Tr. I at 12, 35-36, 46) Based on his training and experience as a police officer, Corporal Lewis identified these items as marijuana and paraphernalia. (Tr. I at 12)

6. Corporal Lewis testified that due to numerous contacts with Bobbi Jo McCubbin over the years, she knew who he was. (Tr. I at 29) Due to the smell, the smoke and the overheard conversation, Corporal Lewis did not ask for permission to enter the apartment. (Tr. I at 29) According to Corporal Lewis, due to the illegal narcotic use that was obviously taking place, there was no longer a need to ask for permission to enter. (Tr. I at 29-30) Corporal Lewis and Officers Grey and Warner just walked in.[5] (Tr. I at 11, 29) Corporal Lewis and Officer Grey each testified that McCubbin had only opened the door halfway, but as they were walking in, she opened it wider.[6] (Tr. I at 51; Tr. II at 33) Corporal Lewis and Officer Grey each testified that they did not recall McCubbin saying anything.[7] (Tr. I at 29, 45) Corporal Lewis looked

---

[2] Bobbi Jo McCubbin testified that there was no knock. (Tr. II at 14, 20) "Tr. II" refers to the transcript of the hearing held on February 16, 2011. McCubbin said she opened the door because she thought she heard somebody out in the hallway. (Tr. II at 14, 20) Magdalen Peterson testified that she heard a knock at the door. (Tr. I at 66) B.S. testified that he heard a knock on the door. (Tr. II at 26-27)

[3] Bobbi Jo McCubbin testified that she believed it was early evening when the police came to her door. (Tr. II at 14)

[4] Bobbi Jo McCubbin disputes that the officers could smell the odor of marijuana because she had incense burning and it had been at least an hour since anyone smoked before the police arrived. (Tr. II at 19-20) Magdalen Peterson testified that she could not smell marijuana in the apartment. (Tr. II at 9-10) B.S. testified that he never smelled marijuana in the living room. (Tr. II at 31)

[5] Magdalen Peterson testified that when the "cops" came through the door, they said, "Boo. Put your hands up." (Tr. I at 66) B.S. testified that when the officer came in, he said, "Boo." (Tr. II at 27) Corporal Lewis and Officer Grey each denied that they said the word "Boo" or heard any other officer say "Boo." (Tr. I at 12 and 49; Tr. II at 36)

[6] According to Bobbi Jo McCubbin, as she started to open the door, she was pushed back into a wall. (Tr. II at 14)

[7] Bobbi Jo McCubbin testified that she screamed for a warrant. (Tr. II at 15) Magdalen Peterson testified: "Bobbi Jo was yelling, don't come in. You can't, you don't have a search warrant. Just to get out of her apartment." (Tr. I at 66) According to Peterson, the officers responded that the reason they were there is they smelled marijuana smoke coming out of the apartment and that was their reason to be able to search. (Tr. I at 70) B.S. testified that

3

around to see who was in the living room while Officers Grey and Warner headed towards one side of the apartment to check for other occupants. (Tr. I at 11, 46) Other than a child who was sleeping in one of the bedrooms, all of the occupants of the apartment were in the living room. (Tr. I at 13, 46-47)

7. The persons in the living room were advised that they would be each be taken out of the apartment one at a time to be checked for weapons. (Tr. I at 13) Corporal Lewis testified that it was necessary to check the occupants of the apartment for weapons for officer safety.[8] (Tr. I at 13) Corporal Lewis testified that due to the configuration of the apartment and the number of people in the apartment (including the police), it was not an ideal situation for safety reasons to check for weapons inside the apartment. (Tr. I at 13)

8. Jeremy Silkwood was one of the persons in the living room of the apartment. (Tr. I at 13) Other persons present were B.S. (Silkwood's son), Magdalen Peterson (Silkwood's girlfriend), Randall Eaves and Brian Thompson. (Tr. I at 17-18, 65-66; Tr. II at 25-26; Defendant's Ex. 1) Peterson testified that she had arrived at the apartment at 9:00 or 9:30 p.m.[9] (Tr. I at 65) According to Peterson, Silkwood was already at the apartment when she got there.[10] (Tr. I at 65) Peterson testified that while she had not used marijuana that evening, everyone else (that is Brian, Bobbi Jo, Jeremy, B.S. and Randy) had been using marijuana in the apartment.[11] (Tr. II at 7) Bobbi Jo McCubbin testified that B.S. was not smoking marijuana, but that she and most of the adults had been smoking marijuana off and on for a few hours that evening. (Tr. II at 19-20) Corporal Lewis was familiar with Silkwood and Peterson. (Tr. I at 13, 18) Corporal Lewis testified that he did not have information that Silkwood was known to be armed and dangerous. (Tr. I at 23) Corporal Lewis testified that prior to having Silkwood stand up, he observed that Silkwood was trying to reach into his pockets. (Tr. I at 14) Silkwood was asked to keep his hands out where the officers could see them. (Tr. I at 14) Corporal Lewis testified that Silkwood appeared to be shocked and very nervous. (Tr. I at 14)

9. Corporal Lewis asked Jeremy Silkwood to stand up and step into the hallway outside the apartment for a pat-down. (Tr. I at 14-16) Silkwood stood up and walked out. (Tr. I at 15) Again, Silkwood attempted to place his hands in his pockets. (Tr. I at

---

McCubbin asked for a warrant repeatedly and that the officers said they had a warrant. (Tr. II at 29)

[8] Magdalen Peterson testified that her purse was searched, but that she was not patted down for weapons. (Tr. I at 69)

[9] Magdalen Peterson testified that she had only been in the apartment for "10, 20 minutes, max" when the police arrived. (Tr. II at 9)

[10] According to B.S., he, his dad and Magdalen Peterson all arrived together in Peterson's car. (Tr. II at 26) B.S. testified that he left to get a pop and then came back. (Tr. II at 31) B.S. testified that he was there 40 to 45 minutes before the police arrived. (Tr. II at 31)

[11] Magdalen Peterson testified that while she had not observed anyone using marijuana, she could tell by looking at them that they had smoked marijuana that evening. (Tr. II at 10)

23-24) Officer Warner conducted the pat-down of Silkwood in the hallway.[12] (Tr. I at 36-37) Officer Warner testified that Silkwood appeared to be excessively nervous in that he was shaking uncontrollably and would not make eye contact with Warner. (Tr. I at 37) Officer Warner testified that he felt a fairly large block-shaped item in Silkwood's back pocket and that it made a crinkling sound. (Tr. I at 37-38) Officer Warner testified that the first thing that came to his mind given the way that it felt was that Silkwood had a brick of marijuana. (Tr. I at 38) Officer Warner testified that this item felt consistent with marijuana that Warner had recovered during previous pat-downs of other persons. (Tr. I at 38) During cross-examination, Officer Warner testified that when he felt the item, he immediately recognized it as marijuana. (Tr. I at 41-42) Officer Warner retrieved the item from Silkwood's pocket. (Tr. I at 39) The item was a partial brick of a green leafy substance inside a plastic bag. (Tr. I at 39) Officer Warner estimated that it weighed between a quarter and a half pound. (Tr. I at 42) Officer Warner testified that the substance smelled of the odor of marijuana. (Tr. I at 39) Officer Warner placed Silkwood's hands behind his back and arrested him for possession of marijuana. (Tr. I at 25, 39) Upon searching Silkwood incident to arrest, a prescription bottle containing numerous, different colored and shaped pills was located in the front left pocket of Silkwood's pants. (Defendant's Ex. 12)

10. Officer Warner called Corporal Lewis out into the hallway to show him the brick-like green leafy substance and pill bottle that he had recovered from Silkwood's person. (Tr. I at 16) Officer Warner told Corporal Lewis that while he was conducting the pat-down, he felt a large bulge in Silkwood's back right pocket of his pants. (Tr. I at 25; Defendant's Ex. 1 at 2) Officer Warner also heard what sounded like a plastic wrapper when he touched the large item. (Defendant's Ex. 1 at 2) Officer Warner believed that the item in Silkwood's pants may be illegal narcotics, so he removed the item from Silkwood's pocket. (Tr. I at 25; Defendant's Ex. 1 at 2) Corporal Lewis gave instructions for Silkwood to be taken to the police station by Officer Grey. (Tr. I at 16-17, 40)

11. Jeremy Silkwood was the first person taken out into the hallway for a pat-down. (Tr. I at 25) Corporal Lewis testified that he chose Silkwood first because he appeared nervous and continued to put his hands in his pockets while sitting down. (Tr. I at 25)

12. Officer Grey escorted Jeremy Silkwood to his police vehicle which was parked about a block from the apartment building. (Tr. I at 48) As Officer Grey was getting ready to search Silkwood prior to placing him in the vehicle, Silkwood told Grey that he had a gun on him. (Tr. I at 48) Silkwood said the gun was on his belt at the front of his pants. (Tr. I at 48) Officer Grey lifted Silkwood's shirt which was covering a

---

[12]Magdalen Peterson testified that Jeremy Silkwood was patted down inside the living room area, but then searched him and put him in handcuffs outside the apartment. (Tr. II at 8) Bobbi Jo McCubbin testified that she did not see the officers pat down Silkwood inside the apartment, but that he was put in handcuffs inside her apartment. (Tr. II at 16, 22) B.S. testified that his dad was not patted down nor handcuffed while he was inside the apartment. (Tr. II at 28-30) Corporal Lewis testified in rebuttal that Silkwood was not patted down nor was he handcuffed while in the living room area of the apartment. (Tr. II at 34) Officer Warner testified in rebuttal that Silkwood was not in handcuffs when he came out into the hallway to be patted down. (Tr. II at 42-43)

holster and a gun. (Tr. I at 49) Officer Grey secured the gun and called over the radio to let other officers know that a gun had been recovered. (Tr. I at 49) The gun was loaded and had a round in the chamber. (Tr. I at 49)

13. Officer Grey radioed Corporal Lewis to tell him that Jeremy Silkwood had a weapon. (Tr. I at 17) Corporal Lewis directed Officer Warner to go to Officer Grey's location to assist him. (Tr. I at 17) Officer Warner ran to Officer Grey's patrol vehicle. (Tr. I at 41) Officer Grey told Officer Warner that he had retrieved the weapon from a holster in Silkwood's front pant area. (Tr. I at 41)

14. Corporal Lewis testified that Sergeant Coffer asked Bobbi Jo McCubbin for consent to search her apartment.[13] (Tr. I at 26) According to Deputy Sheriff Dustin Fisher, McCubbin gave Sergeant Coffer consent to search. (Tr. I at 54)

15. The next day, April 21, 2010, Deputy Sheriff Fisher and Detective Smith interviewed Jeremy Silkwood at the Clay County Detention Center in Liberty, Missouri. (Tr. I at 56) Prior to questioning Silkwood, the officers reviewed with Silkwood and Silkwood signed a waiver of his Miranda rights. (Tr. I at 56; Government's Ex. 1) The form which was signed by Silkwood read in part:

CLAY COUNTY SHERIFF'S DEPARTMENT

CONSTITUTIONAL RIGHTS

DATE __4-21-10__ PLACE __Clay County Detention__ CASE NO. _____

NAME __Jeremy Allen Silkwood__ AGE __36__ D.O.B.: __8-26-73__
ADDRESS _____
EDUCATION LEVEL __12__

Prior to any statement, I have been advised of my right to remain silent, that anything I say can and will be used against me in a court of law, that I have the right to have a lawyer present with me during questioning and that if I cannot afford one, a lawyer will be appointed for me prior to questioning. I have also been told that I can stop making a statement at any time.

__JAS__
(Initials)

I understand all the above, and freely waive these rights, and am willing to make a statement and do not want an attorney.

---

[13]Bobbi Jo McCubbin testified that she was told that she could do this the hard way or she could do this the easy way. (Tr. II at 17) The easy way was to give the officers consent to search the apartment and they would not take McCubbin's child away from her. (Tr. II at 17) If McCubbin would not consent, the officers would get a warrant anyway and they would then call DFS and have McCubbin's child removed from the home. (Tr. II at 17) McCubbin testified that she consented to the search. (Tr. II at 17) McCubbin received a ticket for possession of marijuana and possession of paraphernalia that night. (Tr. II at 17) Both of those tickets were resolved by McCubbin in Excelsior Springs Municipal Court. (Tr. II at 17-18)

> No person has denied me of any of my rights, threatened or mistreated me or forced me to make this statement. No person gave, offered or promised me anything to make this statement, which I give voluntarily of my own free will.
>
>          *JAS*
>        (Initials)
>
> I FULLY UNDERSTAND THESE RIGHTS:     YES  ✓  NO ____
>
>     *Jeremy A. Silkwood*
>    (Signature of person giving statement)
>
> Date    4-21-10    Time    3:26

(Government's Ex. 1)

16. During the interview, Jeremy Silkwood admitted to possession of the gun which had been found on his person on April 20, 2010. (Tr. I at 58) Government's Exhibit 3 is a DVD which contains the video recording of the interview on April 21, 2010. (Tr. I at 59)

17. Deputy Sheriff Fisher had another contact with Jeremy Silkwood later on April 21, 2010. (Tr. I at 60) Silkwood had a probation violation out of Cameron. (Tr. I at 60) Deputy Sheriff Fisher was going to see if something could be worked out on the probation violation if Silkwood would give up the name of the person from whom he had purchased the gun. (Tr. I at 60) Prior to this second interview, the officers reviewed with Silkwood and Silkwood signed another waiver of his Miranda rights. (Tr. I at 60; Government's Ex. 2) Silkwood signed this form at 6:04. (Tr. I at 61; Government's Ex. 2)

18. Magdalen Peterson testified that she has been in a relationship with Jeremy Silkwood for two years and that he currently resides with her in her parents' home. (Tr. II at 6)

### III. DISCUSSION

Defendant Silkwood seeks to suppress all evidence and all testimony relating to such evidence obtained during a search of defendant's person conducted on April 20, 2010, and all statements made by defendant en route to the police station and at the Excelsior Springs Police Department, on the basis that such evidence was obtained in violation of defendant's rights under the Fourth and Fifth Amendments. (Motion to Suppress Evidence and Statements at 1) In support of the motion, defendant argues that before frisking him, the officers must have reasonably believed defendant to be engaged in criminal activity and to be armed and dangerous. (Id. at 3-4) According to defendant, the officers did not have any reason to believe that he was armed and dangerous, rather

the decision was made to pat down all of the occupants for weapons. (Id. at 4) Further, even if the Court determines that the pat-down search for weapons was lawful, defendant argues that the evidence must still be suppressed because the incriminating character of the object seized from defendant's person was not immediately identifiable. (Id. at 4-5) Finally, defendant argues that the prescription bottle containing pills which was subsequently seized from his person, the firearm and defendant's statements should all be suppressed as fruits of the poisonous tree. (Id. at 5)

The record in this case establishes that on April 20, 2010, officers were conducting an operation in Excelsior Springs, Missouri, whereby they targeted suspected narcotics residences to conduct "knock and talks" with whomever answered the doors at said residences. (See Fact No. 1, supra) As set forth in United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008), cert. denied, 129 S.Ct. 1658 (2009), officers need not have probable cause to conduct a "knock and talk" as a "knock and talk" is a consensual encounter and therefore does not conflict with the Fourth Amendment. Bobbi Jo McCubbin's apartment was one of the residences targeted for a "knock and talk" on the evening in question. (See Fact No. 2, supra) As officers were approaching Ms. McCubbin's apartment, they could smell the odor of burnt marijuana. (See Fact No. 4, supra) Officers testified that as they stood directly in front of the closed door of Ms. McCubbin's apartment, the odor of burnt marijuana was stronger. (Id.) Prior to knocking on the apartment door, the officers overheard a male subject from inside the apartment state that he had "a half pound of weed." (Id.) Corporal Lewis then knocked on the door.[14] (Id.) When Ms. McCubbin opened the door, the officers smelled an even stronger odor of burnt marijuana[15] and saw a room filled full of

---

[14] The Court notes that Ms. McCubbin testified that there was no knock. (See Fact No. 4 at n.2, supra) Given that Ms. McCubbin had admittedly been smoking marijuana off and on for a few hours that evening (see Fact No. 8, supra), the Court does not credit her recollection of the events in question when they conflict with the testimony of the officers.

[15] Again, the Court credits the testimony of the officers (Corporal Michael Lewis, Officer Robert Warner and Officer Teague Grey each testified that they smelled the odor of burnt marijuana coming from inside the apartment) over the testimony of Bobbi Jo McCubbin, Magdalen Peterson and B.S. who each testified that they could not smell marijuana in the apartment. (See Fact No. 5 at n.4, supra) Ms. Peterson testified that while she had not used marijuana that evening, everyone else (that is Brian, Bobbi Jo, Jeremy, B.S. and Randy) had

smoke. (See Fact No. 5, supra) In addition, the officers observed a plate on the floor of the living room which contained green leafy substances and rolling papers. (Id.) Based on his training and experience as a police officer, Corporal Lewis identified these items as marijuana and paraphernalia. (Id.) Given what they observed through the open door,[16] the officers abandoned the "knock and talk" and proceeded into the apartment to investigate the suspected crimes that they had come upon. (See Fact No. 6, supra) In addition to the apparent drug usage that was taking place (or had recently taken place) in the apartment, the statement made by one of the men in the apartment that he had "a half pound of weed" might suggest that one of the men was involved in drug dealing. See United States v. Rice, 520 F.3d 811, 818 (7th Cir. 2008)(jury apparently credited testimony that two one-pound and one half-pound bags of marijuana were distribution-level quantities); United States v. Mancillas, 183 F.3d 682, 693 n.19 (7th Cir. 1999)(DEA special agent testified that based on his experience, any amount of marijuana exceeding one-quarter of a pound would be held for distribution rather than personal consumption because in order to use one-half to three-quarters of a pound of marijuana before it loses its THC content and turns stale, a person would have to smoke approximately thirty to thirty-five joints per day).

The persons in the apartment were advised that they would each be checked for weapons. (See Fact No. 7, supra) In United States v. Davis, 202 F.3d 1060 (8th Cir.), cert. denied, 531 U.S. 883 (2000), the Eighth Circuit Court of Appeals found "a protective search for weapons is constitutional ... 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with

---

been using marijuana in the apartment. (See Fact No. 8, supra) Ms. McCubbin testified that B.S. was not smoking marijuana, but that she and most of the adults had been smoking marijuana off and on for a few hours that evening. (Id.)

[16] As set forth in United States v. Peters, 912 F.2d 208, 210 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991), "[w]hen an individual voluntarily opens the door of his or her place of residence in response to a simple knock, the individual is knowingly exposing to the public anything that can be seen through that open door and thus is not afforded fourth amendment protection." Accord United States v. Lloyd, 36 F.3d 761, 763 (8th Cir. 1994), cert. denied, 514 U.S. 1009 (1995).

9

whom he is dealing may be armed and presently dangerous.'" Id. at 1061 (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). The Court finds that the officers had a reasonable suspicion that criminal activity may be afoot and that the persons with whom they were dealing may be armed and presently dangerous. As set forth above, the officers walked in on a room full of people where drug usage was either taking place (or had recently taken place) and the officers overheard one of the men in the apartment state that he had "a half pound of weed" which quantity might suggest that one of the men was involved in drug dealing. "An officer's reasonable belief that someone is involved in drug dealing can support a suspicion that the person is armed since weapons are often present incident to the drug business." United States v. Binion, 570 F.3d 1034, 1039 (8th Cir. 2009). In addition, Corporal Lewis testified that prior to having defendant Silkwood stand up, he observed that Silkwood was trying to reach into his pockets. (See Fact No. 8, supra) Silkwood was asked to keep his hands out where the officers could see them. (Id.) According to Corporal Lewis, Silkwood appeared to be shocked and very nervous. (Id.) When Silkwood was asked to step out into the hallway for a pat-down, he again attempted to place his hands in his pockets. (See Fact No. 9, supra) Officer Warner testified that when Silkwood came out into the hallway, he appeared to be excessively nervous in that he was shaking uncontrollably and would not make eye contact with Warner. (Id.) "To decide whether there is a reasonable, articulable suspicion that a suspect is armed and presently dangerous, [the Court] must consider the totality of circumstances known to the officer at the time of the search." United States v. Glenn, 152 F.3d 1047, 1049 (8th Cir. 1998). The Court finds that Officer Warner was justified in conducting the frisk of defendant Silkwood for officer safety reasons given the drug usage in the apartment, the statement about "a half pound of weed" and the connection between drugs and weapons. Silkwood's actions in repeatedly attempting to reach into his pockets, his nervous behavior and his refusal to make eye contact provided additional suspicion that he might be armed and presently dangerous. See United States v. Hanlon, 401 F.3d 926, 930 (8th Cir. 2005)(defendant's extreme nervousness and failure to make eye contact with officer bolstered officer's reasonable suspicion that defendant was armed and dangerous).

Contrary to defendant's argument that the marijuana must be suppressed as the pat-down search did not reveal the identify of the object, the Court finds that Officer Warner immediately recognized the item as marijuana. Officer Warner testified that the first thing that came to his mind when he felt a fairly large block-shaped item in Silkwood's back pocket was that it was a brick of marijuana. (See Fact No. 9, supra) Officer Warner testified that this item felt consistent with marijuana that Warner had recovered during previous pat-down of other persons. (Id.) Officers may lawfully seize contraband they incidentally discover in "plain touch" during a Terry frisk. See United States v. Bustos-Torres, 396 F.3d 935, 944 (8th Cir.), cert. denied, 545 U.S. 1109 (2005). As explained by the Supreme Court in Minnesota v. Dickerson, 508 U.S. 366 (1993):

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

Id. at 375-76. Given Officer Warner's testimony that the incriminating character of the object was immediately identifiable, Warner was justified in seizing the marijuana. There was no violation of defendant's constitutional rights.

Defendant's final argument, that the prescription bottle containing pills which was seized from his person, the firearm and defendant's statements are all fruits of the poisonous tree which must, therefore, be suppressed, also fails. As set forth above, the frisk of defendant's person for weapons and the resulting seizure of the marijuana from his person were proper. Therefore, the subsequent seizures of the prescription bottle and the firearm and any statements made by defendant could not be considered fruits of the poisonous tree.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Silkwood's Motion to Suppress Evidence and Statements (doc #15).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

        */s/ Sarah W. Hays*
        SARAH W. HAYS
        UNITED STATES MAGISTRATE JUDGE